Dexter A. FORBES, Appellant,

v.

UNITED STATES, Appellee.

No. 9846.

District of Columbia Court of Appeals.

Argued Sept. 27, 1976.

Decided Aug. 9, 1978.

Silas J. Wasserstrom, Public Defender Service, Washington, D.C., with whom Michael L. Rankin, Public Defender Service, Washington, D.C., was on the brief, for appellant.

William J. O'Malley, Jr., Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry, William D. Pease and David M. Bullock, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before KERN, GALLAGHER and MACK, Associate Judges.

GALLAGHER, Associate Judge:

This appeal arises from a jury conviction of assault with intent to commit robbery while armed (D.C.Code 1973, §§ 22–501, –3202) and assault with a dangerous weapon (D.C.Code 1973, § 22–502).[1] Appellant contends that the trial judge erred in (1) denying appellant's motion to dismiss for lack of speedy trial, (2) failing to give a cautionary instruction sua sponte when evidence of prior inconsistent statements was admitted to impeach a defense witness, (3) giving certain instructions on alibi to the jury, and (4) refusing to order a new trial. We affirm.

On the evening of November 3, 1973, Clarence L. Johnson, Jr. and three companions were walking toward Fast Eddie's Carryout when they were approached by a man carrying a sawed-off shotgun. The assailant demanded that Mr. Johnson give him "the bam."[2] When Mr. Johnson responded that he did not have any "bam," the assailant forced Mr. Johnson at gunpoint into a nearby church doorway, took ten dollars from him and shot him in the side of his mouth. Mr. Johnson made his way into the carryout where he waited for the ambulance which transported him to the hospital.

While in the hospital, Johnson was shown a stack of photographs (which included appellant's picture) by Detective Miller but failed to identify appellant's picture. Detective Miller returned a short time later and showed Mr. Johnson the same group of photographs. This time Mr. Johnson identified appellant. At trial he testified that he had not identified appellant the first time the pictures were shown to him because he wanted to avenge the assault himself, but after reflection he had decided to let the police handle the matter.

At trial, Mr. Johnson again identified appellant as his assailant. Johnson's brother, Walter, who had been with him on the night in question gave a general description of the assailant consistent with appellant's appearance. Detective Miller testified that before he showed the photographs to Johnson a second time he assured Johnson that if he was afraid to identify anyone, the police would protect him.

The defense presented seven witnesses. Three persons testified that they were in the vicinity of Fast Eddie's on the night in question, that they knew appellant and that appellant was not the assailant. Three persons testified that they were with the appellant that evening and that he was in a different part of town at the time of the shooting. The jury reached a partial verdict and the court granted a mistrial on several other counts upon which the jury could not decide.

After the trial, defense counsel renewed an earlier motion to dismiss the indictment for lack of speedy trial and also moved for a judgment of acquittal or, in the alternative, for a new trial. After extensive hearings, the trial court denied both motions.

I. Speedy Trial

Appellant contends first that the more than fourteen months delay between

---

1. Only the conviction for assault with intent to commit robbery while armed is appealed. The conviction on assault with a dangerous weapon was vacated by the trial judge as having merged with the first count.

2. "Bam" is a street name for the amphetamine, phenmetrazine.

his arrest and the commencement of the trial denied him his Sixth Amendment right to a speedy trial. While this court has held that a delay of a year or more gives prima facie merit to a claim of denial of speedy trial, *Branch v. United States,* D.C.App., 372 A.2d 998 (1977), the length of delay is not the only material factor.[3] In *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court identified three other elements which must be examined in weighing a speedy trial claim: (1) the reasons for the delay, (2) the defendant's assertion of his right, and (3) prejudice to the defendant. In discussing these factors the Court stated:

> We regard none of the four factors identified . . . as either a necessary or sufficient condition to the finding of a deprivation of the right of a speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. . . [C]ourts must still engage in a difficult and sensitive balancing process. [*Id.* at 533, 92 S.Ct. at 2193; footnote omitted.]

 It is true that appellant's counsel asserted the right before trial but when balanced against the reasons for the delay and the lack of prejudice to the defendant, the scale tips for the government. While part of the delay was due to court congestion which must be weighed against the government, *Barker v. Wingo, supra* at 531, 92 S.Ct. 2182, a substantial part of the delay can be attributed to the fact that there were two other outstanding indictments against appellant. Appellant was represented by the same attorney in all three cases, and the record indicates the cases were scheduled together on the court's calendar. The initial trial date, April 11, 1974, was continued on request of appellant's

counsel. On July 30, 1974, the government requested a continuance because a key witness had failed to appear. The court indicated it would dismiss the case that afternoon if the government was unable to proceed. At this time the court also inquired of defense counsel whether he was going to object to a new indictment filed by the government in another case.[4] After counsel indicated he would not, the government located the witness and announced it was ready to proceed. Appellant's attorney then changed position and obtained a continuance in order to file a motion to dismiss the indictment on the ground that it was improperly returned. On August 21, 1974, appellant's motion was heard and denied. On that same day, appellant's attorney withdrew in all three cases. After a second counsel was appointed for appellant the cases proceeded in an expeditious manner. Appellant cannot be heard to say that delay caused by his other trials should be held against the government.[5]

Finally, we find no prejudice to the defendant in the delays in this trial. Some of his witnesses were discredited, but not by a showing that their memories had failed. His witnesses testified in considerable detail, and one of appellant's alibi witnesses appears to have been discredited somewhat for having remembered *too much* detail.

Under these circumstances, we conclude there was no denial of appellant's right to a speedy trial.

## II. Lack of Sua Sponte Instruction After Impeachment

 Appellant also contends that the trial court erred in failing to give sua sponte a cautionary instruction with respect to the limited admissibility of a prior incon-

3. In fact, delays of over 30 months have been upheld, *e. g., United States v. Lynch,* 163 U.S. App.D.C. 6, 499 F.2d 1011 (1974); *United States v. Ransom,* 151 U.S.App.D.C. 87, 465 F.2d 672 (1972).

4. This indictment originated out of another felony case in which appellant had a codefendant. The new indictment was identical in all respects as to appellant; the only language

changed was one count relating to his codefendant.

5. *See also* § 2.3(a) of the *American Bar Association Standards Relating to Speedy Trial,* which states that the period of delay resulting from other proceedings concerning the defendant should be excluded in computing the time for trial.

sistent statement used to impeach a defense witness. As counsel did not request such an instruction either at the time of the testimony or when the court instructed the jury, as required by Super.Ct.Cr.R. 30,[6] we are precluded from reversing unless such failure amounts to plain error within the meaning of Super.Ct.Cr.R. 52(b). This court recently held in *Johnson v. United States,* D.C.App., 387 A.2d 1084 (en banc) (1978), that it was not plain error under the circumstances of that case for a trial judge to fail to give sua sponte an immediate cautionary instruction when a witness has been impeached by a prior inconsistent statement. Appellant argues, however, that prior statement in this case was subject to misuse by the jury and the trial court's failure to act sua sponte to insure that the jury understood the limited purpose for the admission of the statement constitutes plain error.

Here there was little problem of jury confusion. The prosecutor made it quite clear at the time of cross-examination that he was using the statement for impeachment purposes.[7] The trial court would have been better advised to give an immediate instruction informing the jury of the limited purpose for which the evidence was admissible. It is an elementary procedure with some trial judges. But we do not find the failure to do so here prejudicial to the defendant's case so as to compel the conclusion there was plain error.

Since the witness' prior statement was given under oath before the grand jury, we find appellant's argument less convincing than the argument advanced in *Johnson v.*

*United States, supra.* The recently-enacted Federal Rules of Evidence provide that a statement is not hearsay if

[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, *and was given under oath* subject to the penalty of perjury at trial, hearing, or other proceeding . . . [Rule 801(d)(1); emphasis added].

While not binding here, in federal court the failure to give a cautionary instruction as to the limited relevance of the prior statement would not have been error at all, let alone plain error. One would have to consider the federal judiciary has gone far afield in the reasoning underlying its rule in order to conclude, as the dissenting opinion does, that there was plain error here.

We might say in passing that, as exemplified by enactment of the federal rule, the traditional view that prior inconsistent statements are hearsay and inadmissible as substantive evidence has come under attack in recent years. One leading commentator has stated:

It is hard to escape the view that evidence of a previous inconsistent statement, when declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony. Allowing it as substantive evidence pays an added dividend in avoiding the ritual of a limiting instruction unlikely to be heeded by a jury. McCormick, Evidence § 251 at 603–04 (2d ed. 1972).

We find no grounds for reversal on the failure of the trial court to give the instruc-

---

**6.** Rule 30 provides in part:

No party may assign as error any portion of the charge *or omission therefrom* unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. . . . [Emphasis added.]

**7.** The prosecutor asked the witness if she had been threatened. When the witness replied "no," the prosecutor introduced the witness' grand jury testimony in which she had stated, "This dude or friend, I guess, of Dexter walked up to me and told me that if I told anything on Dexter, I would be in trouble . . . . . I have

no reason to lie. He [Forbes] wasn't down there the night Clarence got shot." After the witness stated she did not remember saying anything about being threatened and that she had not been threatened, the prosecutor continued:

Q. If you said that, you would have been lying under oath?
A. If I would have said that, yes.
Q. Or is it today?
A. What today?
Q. Are you lying under oath today?
A. No, I'm not lying. I have no reason to lie.

tion where none was requested. *Johnson v. United States, supra.*

## III. Alibi Instructions

■ Appellant alleges that in reinstructing the jury on the defense of alibi the trial court improperly shifted the burden to appellant to establish his innocence. During deliberations the jury requested further instructions with respect to the alibi defense.[8] After considerable discussion with counsel, the judge, over the objection of defense counsel, gave the following instruction to the jury:

The Government has offered evidence in the hopes of persuading you that they have carried their burden of proving beyond a reasonable doubt that the defendant was present at the time and place alleged in the indictment.

The defendant, however, contends that the Government has not carried its burden of proof because the defendant contends that he was somewhere other than the place and time alleged in the indictment.

. . . . .

If this evidence of the defendant, considered in its entirety, is sufficient to cause you to have a reasonable doubt as to whether the defendant was present at the time and place alleged, you must find the defendant not guilty.

If, on the other hand, the evidence of alibi, considered in its entirety, does not cause you to have a reasonable doubt as to whether the defendant was present at the time and place alleged in the indictment, then you may find the defendant guilty, assuming, of course, that you are satisfied beyond a reasonable doubt that the Government has proved all the other essential elements of the offense.

I hope I have answered your question. If I have not, I will entertain another question. You want to go back to the jury room and see if this does the job?

This instruction does not shift the burden to the defendant to prove his alibi.[9] The judge stated that the government had the burden of proving beyond a reasonable doubt that defendant was present at the time and place alleged in the indictment and if the alibi evidence was sufficient to cause the jury to have a reasonable doubt as to the first fact it *must* find the defendant not guilty.

The two cases which appellant relies upon are distinguishable. In *United States v. Scott,* 174 U.S.App.D.C. 96, 529 F.2d 338 (1975), the Court of Appeals reversed a conviction because the trial court gave the following instruction:

Intoxication is not an excuse for the commission of a crime. Voluntary drunkenness is no defense to a criminal act unless specific intent or knowledge is an element of the offense; *then drunkenness may be shown to prove mental incapability to form the specific intent.* [*Id.* at 98, 529 F.2d at 340 (emphasis in original).]

The trial court had rejected a commonly accepted instruction and instead gave that questionable one, to which objection was made by defense counsel. The court concluded that the instruction given could well have been understood by the jury to place

8. The foreman of the jury requested the reinstruction and explained their confusion by stating:

I think, Your Honor, our question springs from when the counsel for the Government, Mr. Bullock, was summing up. There was a controversy about a point he made on the law with respect to alibis. You ruled you would give us more detail.

I think the issue we're confused about, if our judgment is, let's say, to reject the defendant's alibi to some degree, does the law then say we, in effect, are rejecting the entire alibi and conversely, if there are some elements of the alibi that we find acceptable, how does that affect our judgment as far as the law with respect to the validity of the alibi as a whole?

It appears that the confusion was due to a statement made by the prosecutor in his final argument. The statement was to the effect that even though it had no burden to do so, the government had proven beyond a reasonable doubt that defendant's alibi was false.

9. Appellant did not explain in his brief why he considered that the instructions placed the burden on him.

the burden on the defendant to establish lack of specific intent.

In *United States v. Alston,* 179 U.S.App. D.C. 129, 551 F.2d 315 (1976), credibility was crucial in the case and appellant relied upon an alibi. Viewing the instructions in their entirety, the court concluded they did not adequately inform the jury that the defense "alibi evidence need only raise a reasonable doubt in their minds that the defendant was present at the crime scene; that they must consider the evidence in its totality, including the alibi evidence, in deciding the defendant's guilt; and that the burden of proof never shifts." *Id.* at 133, 551 F.2d at 319 (footnotes omitted).

Taken as a whole, the instructions here do not have those deficiencies. As a matter of fact, the questioned reinstruction on alibi, which had been requested by the jury, specified that before finding the defendant guilty the jury must be "satisfied beyond a reasonable doubt that the Government has proved all the other essential elements of the offense." We consider that the instructions in this case were not prejudicial to appellant.

### IV. Motion for a New Trial

Finally, appellant alleges that the trial court abused its discretion in refusing to order a new trial because the verdict was clearly contrary to the weight of the evidence. In addition, he argues that a new trial should have been granted on the ground of newly discovered evidence.[10]

In reviewing a trial court's denial of a motion for new trial, we must give great weight to the trial judge's ability to judge the credibility of the witnesses and to observe their demeanor. An appellate court should not reverse the trial court unless there has been a clear abuse of discretion. *United States v. Anderson,* 165 U.S. App.D.C. 390, 509 F.2d 312 (1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975); C. Wright, Federal Practice and Procedure—Criminal § 557 (1969). On review of the record it appears to us that the verdict was not clearly contrary to the weight of the evidence.[11] Thus, the trial court did not abuse its discretion in denying the motion.

Appellant's second argument is that there is newly discovered evidence which mandates that he be given a new trial. We agree with the trial judge, however, that the grant of this motion "would not be in the interest of justice, but would be a travesty of justice." At the hearing on the motion for a new trial appellant produced additional witnesses who testified that appellant was not Johnson's assailant. We find it significant that appellant claims he found four witnesses within a week after the trial while at the same time he argues that he was prejudiced by the fourteen months delay between his arrest and trial. While his attorney may not have known about these witnesses, appellant had information which would have led the attorney to them within that time.[12] Additionally, at trial he chose not to introduce one poten-

---

**10.** Rule 33 of the D.C. Rules of Criminal Procedure states:

> The court on motion of a defendant may grant a new trial to him if required in the interest of justice. . . . A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment . . . . A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix.
> . . .

**11.** Appellant makes much of the fact that he had more persons testifying in his defense than the prosecution had testifying against him. The jury apparently was unimpressed with the

numbers and chose to believe the prosecution's witnesses. This they were free to do. Most of the defense's witnesses were eventually discredited in one way or another.

**12.** The four new witnesses are Eddie Gardner, proprietor of Fast Eddie's, Ralph Sims, Joseph Johnson and Ronald Epps. Ralph Sims admitted at the hearing on the motion that he visited the appellant in jail several times, and he told Joe Johnson of appellant's arrest. Eddie Gardner as proprietor of Fast Eddie's was a person known to the appellant and according to his testimony at the hearing could have added little to the defense case for he only had a glimpse of the back of the man who he thought shot Mr. Johnson.

tial witness who was present in the court-room.

A new trial should be granted only when evidence which the defendant could not have known about through diligent search comes to light after trial. *Heard v. United States,* D.C.App., 245 A.2d 125 (1968). It is not a second chance for a trial. The evidence which appellant brought forward after trial was not "newly discovered" and there was no showing of exceptional circumstances which in the interest of justice would warrant a new trial. *Huggins v. United States,* D.C.App., 333 A.2d 385 (1975). Accordingly, we do not find that the trial judge abused his discretion in denying the motion for new trial.

Appellant's conviction is

*Affirmed.*

KERN, Associate Judge, concurring.

While I am able to join in Judge Gallagher's opinion affirming the conviction upon the particular facts in this case,[1] I do wish to point out to bench and bar that our recent decisions in *Watts v. United States,* D.C.App., 362 A.2d 706 (1976) (en banc), and *Johnson v. United States,* D.C.App., 387 A.2d 1084 (No. 8683, 1978) (en banc), do not obviate the necessity of giving to the jury a cautionary instruction at *some* point before the jury takes the case when one party impeaches the credibility of a witness of the other party with a prior inconsistent statement as occurred here.[2]

Indeed, the importance of a cautionary instruction as to the limited purpose of impeaching material was underscored in *Dixon v. United States,* D.C.App., 287 A.2d 89, 99, *cert. denied,* 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972), where we up-

held the government's use of a prior conviction to attack the credibility of a defendant at trial but noted that a cautionary instruction by the trial court sometime before the jury took the case assured "the basic fairness necessary to uphold the constitutionality of the use of prior convictions." In sum, the omission committed by the trial court here was extremely serious and to me comes close but does not quite reach the level of plain error.

I also agree with a point made in the dissenting opinion: that there was considerable imprecision by the court and counsel in their discussion of the ground for admitting at trial the defense witness' prior inconsistent statement to the grand jury. However, the very point of Rule 30, it strikes me, is to preclude counsel from citing on appeal omissions by the court at trial which were not specifically and precisely brought to the court's attention and an opportunity for correction thereby afforded.

MACK, Associate Judge dissenting.

In my view the admission of a prior inconsistent statement by a key defense witness without an accompanying instruction presented the likelihood of jury confusion so great as to have denied appellant a fair trial.

I am acutely aware that this court, *en banc,* has held that it is not plain error, *per se,* for a trial court not to give an immediate cautionary instruction on the use of evidence admitted for a limited purpose when no such instruction is requested. *Johnson v. United States,* D.C.App., 387 A.2d 1084 (en banc) (No. 8683, 1978). The instant case, however, is a much more difficult case than *Johnson* and for many reasons. Here, for example, neither an imme-

---

1. The material damaging to the defense contained in the witness' prior inconsistent statement was that a friend of appellant said to her she would be in trouble if she "told anything on Dexter." On the other hand, the impeaching statement also contained the witness' response to this approach: that she had "no reason to lie. He [appellant] wasn't down there the night Clarence [the complainant] got shot." Thus, this part of the prior statement by the witness was entirely consistent with and served to rein-

force her trial testimony that appellant did *not* commit the crime charged.

2. I call attention also to our reaffirmance in *Johnson v. United States, supra* at 1087 n. 6, that a sua sponte cautioning instruction is *required* when a party, *surprised by its own witness,* impeaches the witness with a prior inconsistent statement in accordance with D.C.Code 1973, § 14–102.

diate cautionary instruction nor a final instruction was given as to the limited purpose of the evidence. By contrast, in *Johnson* the final charge included an instruction on the limited purpose for which a prior inconsistent statement could be used and this court relied specifically upon that fact in rejecting the claim of clear prejudice to Johnson's substantial rights.

But more basically, here the record raises a serious question as to the purpose for which the evidence was admitted. There are circumstances, therefore, which make defense counsel's failure to request a limit-

ing instruction understandable and the probability of confusion indisputable. The majority says that the prosecutor made it quite clear at the time of cross-examining Ms. Morris that he was using her prior inconsistent statement (to the effect that she had been threatened by friends of appellant) for impeachment purposes. What the prosecutor actually proffered at the bench, in response to objection by defense counsel to the admissibility of the statement, was that the evidence went to credibility and state of mind *and* "whether she's afraid today to testify to the fact that Dexter Forbes did the shooting." [1] The

1. The relevant testimony was as follows:
Q. [By Mr. Bullock, counsel for the Government]: Some friends of Dexter's threatened you in this case?
A. [Ms. Morris]: No, they didn't.
Q. Are you sure of that?
A. Yes, I am.
Mr. MC HALE [counsel for appellant]: May we approach the bench? . . .
THE COURT: What's the basis for that question?
MR. BULLOCK: She testified to that in the grand jury. She testified she was threatened in the grand jury.
THE COURT: What is the basis?
MR. MC HALE: I have read the testimony and I don't think she said that. The problem is, there's no shown connection between that and Mr. Forbes.
MR. BULLOCK: It doesn't matter. We're going to hear credibility and state of mind and whether she's afraid today to testify to the fact that Dexter Forbes did the shooting. It doesn't matter whether he had any connection with it.
MR. MC HALE: The jury is going to think he did, whether anything is brought out or not. It seems, unless Mr. Bullock is prepared to make the correction that it's going to cloud the issue for Mr. Forbes.
MR. BULLOCK: She—
THE COURT: She comes in here and testifies that she saw the gunman and it wasn't Dexter Forbes. Now, in the testimony before the grand jury, if she testified she was afraid—
MR. BULLOCK: She encountered, personally, some friends of Dexter Forbes and they threatened her and told her that she had better not identify Dexter Forbes.
THE COURT: She told the grand jury this?
MR. BULLOCK: Right.
THE COURT: It's perfectly probative.
MR. MC HALE: My fear is, it's going to—the jury is going to link it up with Dexter Forbes, when there's no such link before them.
THE COURT: She provided the link to the grand jury.
MR. MC HALE: Not Dexter Forbes.

THE COURT: She said friends.
MR. BULLOCK: Yes.
THE COURT: I overrule the objection. . .
Q. [By Mr. Bullock]: Ms. Morris, I asked you whether it wasn't a fact some friends of Dexter threatened you.
A. No, they didn't, because I don't know any of Dexter Forbes' friends.
Q. You're absolutely certain nobody threatened you in this case?
A. No one threatened me.
Q. Do you remember testifying before the grand jury on December 11th, 1973?
A. Yes.
Q. You were under oath at that time?
A. Right.
Q. There were twenty-three or fewer grand jurors there and there was a prosecutor there by the name of Finnegan?
A. Yes.
Q. There was a reporter there?
A. Yes.
Q. And, you testified with respect to the incident, much as you testified today, did you not?
A. Yes.
Q. All right.
You remember this series of questions and answers? I'm going to read and ask you if you remember.
(Reading) "Question: Since that happened on November 4th, have you received any type of threat? Answer: Yes.
"Question: What was the nature of the threat and how did you get the threat? Answer: This dude or friend, I guess, of Dexter walked up to me and told me that if I told anything on Dexter, I would be in trouble and I told him, "Like what, anything like what on Dexter told he shot Clarence or something, and he said yes."
You went on to say, "I have no reason to lie. He wasn't down there the night Clarence got shot."
Do you know the series?

court observed that this evidence is "perfectly probative." When defense counsel objected that the threat had not been linked to appellant, the court answered "She provided the link to the grand jury . . ." and overruled the objection. This colloquy suggests to me that the statement was admitted in part for its substantive value and what transpired thereafter appears to confirm this suggestion. Thus the government produced a witness on rebuttal for the sole purpose of testifying that the hospitalized victim had been removed to a security ward for protection. In closing argument the prosecutor argued that Ms. Morris was not to be believed and added that "Doesn't it all add up that she was threatened?"

These facts are important to the resolution of this case. If defense counsel was laboring under the impression that the evidence had been ruled to be probative for all purposes, then there was no point in requesting a limiting instruction. The government takes the position that the evidence was admissible to prove that the witness had been threatened. Of course the whole point of impeachment is to show that a witness is lacking in credibility. But its purpose is to discredit the witness, not to establish facts in dispute. *See United States v. Gilliam,* 157 U.S.App.D.C. 375, 484 F.2d 1093 (1973). In the traditional sense impeachment is accomplished by showing former declarations or behavioral patterns on the part of the witness which are inconsistent with answers given by the witness at trial. Here the grand jury testimony was clearly admissible to show that Ms. Morris had made a prior inconsistent statement. It was not necessary therefore for the government to use the testimony to show that the witness had been threatened. Assuming that fear as a motivating factor may be probative to show that a witness is not worthy of belief, the risk here that the jury might use the threat as evidence of wrongdoing on the part of the appellant was so great as to upset the balance of advantage of [the minimum probative value of] receiving it as a fact. *See Shepard v. United States,* 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933).[2] I believe it was error to use the evidence for this purpose and particularly so because the threat had not been tied to appellant. *Cf. Light v. United States,* D.C.App., 360 A.2d 479, 481 (1976); *United States v. Bussey,* 139 U.S.App.D.C. 268, 273, 432 F.2d 1330, 1335 (1970). This

A. I don't remember them asking me did anyone threaten me and I don't remember answering yes to that.
Q. You don't remember that?
A. No, I don't.
Q. Are you denying you said it?
A. I'm not denying. I just don't remember I said yes to that and him asking me that.
Q. If you were threatened—you would have said no, you were not threatened, if you were asked the question?
A. Yes, I would have said no, because I haven't been threatened because I don't know his friends.
Q. If you were asked that question in the grand jury and you gave this answer, you would have been lying under oath?
A. If I would have gave what?
Q. If you had been asked this question and given the answer I told you, then you would have been lying under oath?
A. If I would have said—no.
Q. You said you were not threatened. If you had said that you were, you would have been lying under oath, wouldn't you?
A. But, I don't remember saying that. I can't say whether I'm lying because I don't remember answering yes to that question.

Q. If you said that, you would have been lying under oath?
A. If I would have said that, yes.
Q. Or is it today?
A. What today?
Q. Are you lying under oath today?
A. No, I'm not lying. I have no reason to lie.

**2.** In *Shepard,* Mr. Justice Cardozo, speaking of rebuttal testimony which spoke (as did the threat here) to a past act by someone not the speaker, to the prejudice of the accused, said:

> Discrimination [by the jury to accept for one purpose and reject for another] so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out. [290 U.S. at 104, 54 S.Ct. at 25 (citations omitted).]

court has reminded recently that the government may not use otherwise admissible evidence for an impermissible purpose. *Ward v. United States,* D.C.App., 386 A.2d 1180 (1978).

Moreover, I am satisfied that any prejudice to appellant could not have been harmless. Ms. Morris was a crucial witness as both the government and the court recognized. She was an eyewitness who testified unequivocally that appellant was not the attacker (and despite the fact that other eyewitnesses testified to the same fact) her testimony was damaging to the government because she was a friend—"like a sister" to the victim. The evidence that she had been threatened by appellant's friends not only effectively destroyed her testimony but undoubtedly had a "spill-over" effect as far as the other defense witnesses were concerned.

As for the government's evidence, this was essentially a one-witness (the victim) identification crime with the problem being not the opportunity to observe (since the victim knew the defendant) but rather the uneasy suggestion in some testimony that the hospitalized victim might be identifying the wrong man as a result of trauma.

This is a troublesome case factually and legally. Cautionary instructions would have provided a much needed safeguard. I respectfully dissent.