Pernell JACKSON, Appellant,

v.

UNITED STATES, Appellee.

No. 7570.

District of Columbia Court of Appeals.

Argued Sept. 23, 1974.

Decided April 1, 1976.

"show-up" as one of the two men who had earlier robbed him in his home;[3] and

(3) It failed to instruct, either sua sponte during the course of the trial or in its general charge to the jury, that the consistency between certain parts of a written statement, made by complainant prior to trial and received in evidence, and his testimony at trial might be considered by the jurors *only* in evaluating his credibility and *not* as establishing the truth of any fact set forth in these parts of the statement.

The government's case against appellant rested entirely upon the testimony of one Smith, the victim of the robbery. In essence he testified that appellant and another man, with drawn pistols and without warning, confronted him after midnight as he was ushering two guests through the gate onto the street from his apartment on East Capitol Street. The armed men forced Smith and his visitors to return to the living room of his apartment, and appellant held him at gunpoint while the other assailant looked for but took no property. They next led him to the bedroom where they gathered up various personal property, cash, and a pet puppy and then bound his hands and feet and left him on the floor.

Smith had seen appellant before the robbery, and he saw him (together with his companion in crime) walking on the street three days *after* the robbery; but by the time the police arrived and they and complainant could search the area, the culprits could not be found. While driving on H Street, Northeast, some three weeks after the robbery, Smith again saw appellant—this time in conversation with two

Warren C. Nighswander and Constance O'Bryant, Washington, D. C., appointed by this court, for appellant.

James N. Owens, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and James F. McMullin, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

John McCahill, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before KELLY, KERN and HARRIS, Associate Judges.

KERN, Associate Judge:

Appellant was convicted by a jury of armed robbery and first degree burglary while armed and received from the trial judge concurrent sentences of three to nine years' imprisonment. His appeal asserts artfully and vigorously that the court committed three errors necessitating reversal:

(1) It refused to invoke the Jencks Act[1] and strike the complainant's testimony, after the police officer who responded first to the scene of the crime was unable to produce at trial his notes of an interview with the complaining witness or the offense report (P.D. 251) the officer testified he had prepared *at that time.*[2]

(2) It received into evidence at trial over defense objection of impermissible suggestivity complainant's out-of-court identification of appellant at a one-man

---

1. 18 U.S.C. § 3500 (1970).

2. A P.D. 251 report he prepared three weeks later from his notes was turned over to the defense at trial in the usual way.

   The trial court found after a hearing out of the presence of the jury that the officer had *never* prepared an offense report on the night of the crime.

The judge also expressed disbelief at the officer's testimony concerning the description given by complainant at the scene on the night in question.

3. Appellant also argued that complainant's in-court identification of him as a robber was tainted by the out-of-court identification.

other persons. Smith "slowed up and took a good look" and then drove into the next block, hailed a police officer passing by and told him whom he had seen, what the latter had done, and how he was dressed. That officer, in Smith's presence, broadcast over his police radio the description Smith had given him and the location of appellant. Smith identified appellant as the man he had just seen on the street and the man who had robbed him.

The defense case consisted of (a) testimony by appellant's grandmother that he could not have been at Smith's house on the night in question, (b) testimony by the officer who had responded to the scene of the crime concerning the description of the robbers Smith had given then, and (c) quite vigorous cross-examination of Smith, which included confronting him with a seven-page written statement containing information given by him to defense investigators before trial and differing in parts from his testimony.

We now consider appellant's specific contentions against the general background outlined above. First, appellant says a serious Jencks Act problem is presented because the police officer responding to the scene of the crime was unable to produce at trial either the rough notes he testified he had written while interviewing the complainant Smith immediately after the robbery or the offense report he had prepared, according to his testimony, later that night from those notes. Appellant points out that "any prior description of the actual assailant which was different from that given at trial and different from appellant's actual appearance was crucial to the defense" and, accordingly, with this mate-

rial absent from the trial, he argues that the trial court should have applied the Jencks Act sanction, 18 U.S.C. § 3500(e) (1970), of striking Smith's testimony in its entirety. Such action, of course, would have demolished the government's case.

We note that a P.D. 251 prepared by the officer after the offense and based on his notes was in fact turned over to appellant's counsel at trial. This P.D. 251 contained a description of the alleged robbers different from that given by complainant at trial. We further note that the officer, testifying as a defense witness, recounted the description of the assailants given on the scene which differed from (a) complainant's description of appellant during his own testimony at trial and (b) appellant's actual appearance. Thus the discrepancy which appellant argues was "crucial" to his defense was presented to and fully developed before the jury. Under these circumstances we fail to find prejudice incurred by appellant as a result of the fact that the officer could not produce his rough notes at trial.[4]

Appellant in addition argues that the officer's inability to produce at trial his rough notes taken on the scene precludes ever knowing "whether there were other similarly significant discrepancies between . . . [the officer's] original notes and the testimony of the complaining witness at trial." Given the brief time the officer spent with Smith and the former's ultimate report to the dispatcher that "no useable lookout" existed it seems unlikely that his rough notes contained anything more than a general description of the robbers. Moreover, the officer was called as a wit-

---

4. The trial court found as a fact that, contrary to the officer's testimony, he had *not* made out a P.D. 251 at all on the night in question but had waited several weeks before doing so. We are satisfied upon review of the record that there is evidence to support this finding. The responding officer and the complainant clashed on the scene (the former deeming the latter "uncooperative," and he in turn characterizing the officer as very "belligerent" and "arrogant"); the officer left without taking a full report, radioing to the dispatcher that "no police report [was] necessary," and then, when ordered to return by a superior, "was even more distressed with Mr. Smith," and took his report on a sheet of paper rather than in his diary in the usual way. No trace of the P.D. 251 he said he made that night could ever be found.

ness and thus there appears to have been opportunity for appellant's counsel to have developed through questioning any other discrepancies if they existed.

■ We also reject appellant's contention that the showing to Smith of appellant in the back of the police cruiser immediately after his arrest was so unnecessarily suggestive and conducive to misidentification as to violate due process and require exclusion of *both* that identification and the subsequent in-court identification by Smith. Appellant's point in essence is that immediately upon arrest he should have been taken directly to the station rather than driven to the next block for viewing by Smith.

In the instant case the victim had *twice* encountered by chance appellant on the street between the date of the robbery and the arrest three weeks later; the two arresting officers had had no prior connection with this case and merely responded to a lookout broadcast by the officer Smith contacted after having seen appellant in the next block; and, that officer in turn was simply reacting to Smith's assertion that the man he had spotted talking with two other men at 9th and H Streets was the same man who had robbed him three weeks earlier. We also note that Smith had observed appellant in his home, which was lighted, for some 10 to 15 minutes at least during the robbery and testified he "just has a face you wouldn't normally forget if you were in a serious matter with him."

This case bears a striking resemblance to *Evans v. United States,* 141 U.S.App.D.C. 321, 438 F.2d 162 (1971), where the federal Circuit Court upheld a conviction against a claim of impermissible police action upon the following facts. The victim of a crime saw by chance some days later on the street a man whom she believed to have been her assailant. Her companion at that time called the police and the responding officer effected the arrest but immediately thereafter showed him to her for confirmation. She identified him as the perpetrator of the crime, basing her identification not just upon the accidental street encounter but also upon the opportunity she had had to see him during the crime's actual commission.

Appellant seeks to distinguish *Evans* from the instant case upon the ground that the arresting officer *there* was *less* certain he had picked up the right man than the arresting officer *here.*[5] We are not persuaded that this is such a significant difference as to justify a different result in this case than in *Evans.* Rather, in both cases, we see the critical factors to be: the arresting officers knew nothing about the cases beforehand and were responding in an emergency situation; the person arrested was taken to the complainant within a matter of no more than several minutes and a distance of a block or less away; and, the victim had had ample opportunity to view the perpetrator during the crime. Accordingly, we conclude that the police action here was *not* the result of a deliberate police purpose to circumvent the dictates of the Constitution in the pretrial identification context of this case and therefore must be upheld under these particular facts.

Finally, appellant complains that the trial court inadequately instructed the jury concerning a statement in writing defense investigators obtained from the complainant prior to trial and used to cross-examine him during trial. First, we sketch the factual background for appellant's argument.

After Smith testified on direct examination, defense counsel identified the statement and then proceeded to develop in cross-examination some discrepancies between what the complainant had said from the witness stand and what he had said be-

5. Specifically, appellant points to the testimony by one of the two arresting officers that he believed he had probable cause to arrest and testimony by the officer who was with Smith that the arresting officers "talked" over their radio with him about appellant's appearance before arresting him.

fore trial to the investigators, at least according to the statement.[6] On redirect the prosecutor read portions of the statement which were consistent with Smith's testimony. Neither counsel then requested nor did the trial court give, sua sponte, any instruction concerning the "impeaching" character of the statement. Subsequently, after all the testimony had been completed and just before counsel commenced argument to the jury, the statement itself was received into evidence by the trial court upon motion by defense counsel. Immediately after the summations by both counsel, the trial court rendered its charge during which it referred to the statement.

The Young Lawyers Section of the Bar Association of the District of Columbia has compiled a set of suggested instructions for use in criminal trials which contains, among others, Instruction 1.06 entitled "Impeachment by Prior Inconsistent Statements." The trial judge read *verbatim* the first paragraph of Instruction 1.06 providing:

> The testimony of a witness may be discredited or impeached by showing that he has previously made statements which are inconsistent with his present testimony. *The prior statement is admitted into evidence solely for your consideration in evaluating the credibility of the witness.* Should you find the prior statement to be inconsistent, you may consider such statement only in connection with your evaluation of the credence to be given to the witness' present testimony in court. *You must not consider the prior statement as establishing the truth of any fact contained in that statement.* [Emphasis added.]

The trial court *failed,* however, to read the *second* paragraph of Instruction 1.06 which provides:

> The testimony of a witness may be rehabilitated or supported by showing that he had previously made statements which are consistent with his present testimony. *The prior statement is admitted into evidence solely for your consideration in evaluating the credibility of the witness.* Should you find the prior statement to be consistent, you may consider such statement only in connection with your evaluation of the credence to be given to the witness' present testimony in court. *You must not consider the prior statement as establishing the truth of any fact contained in that statement.* [Emphasis added.]

Neither trial counsel objected to what the judge had done, *viz.,* reading the first paragraph but not reading the second paragraph of Instruction 1.06.

Thus, we are left with the issue whether the unexplained and apparently unnoticed omission of one paragraph of a jury instruction[7] constitutes plain error and now necessitates reversal of a hotly-contested and tenaciously-tried three-day trial.

In assessing the possible prejudice to appellant by reason of the trial court's failure to read the *entire* instruction we note that the jury was in fact unequivocally instructed, shortly after the statement was received in evidence, "You must not consider the prior statement as establishing the truth of any fact contained in the statement," and, "The prior statement is admitted into evidence solely for your consideration in evaluating the credibility of

---

6. Smith insisted that the statement inaccurately memorialized what he had in fact said to the defense investigators, one of whom later was called as a witness by appellant's counsel to explain how the statement had been taken.

7. Prior to the rendition of the final charge to the jury, defense counsel stated to the court, "I would also request 1.06, which is on impeachment." Whereupon the prosecutor responded, "I think that probably should be given also, Your Honor. I neglected to include that."

The trial court made no comment, although he immediately thereafter expressly denied two different instructions requested by defense counsel. Thus, there is a reasonable inference that the court was in agreement that the *entire* instruction, as contained in the so-called "Red Book", should be given.

the witness." This charge was essential because it told how to regard the statement. While it is true that had the judge also read the second paragraph of Instruction 1.06 this same admonition would have been *repeated*, we do not view the failure so to repeat as plain error requiring reversal. In short, it was enough for the jury to be instructed once as to how to treat the statement of Smith, the complainant.

Appellant argues, however, that the judge, by reading the *first* paragraph of Instruction 1.06 and failing to read the second, may have confused the jurors by drawing their attention only to the statement's "impeaching-by-prior-inconsistencies" quality and *not* the statement's "rehabilitating-by-prior-consistencies" quality. However, this omission seems to us on balance to have prejudiced the government more than the defense because it had the effect of again focusing the jury's attention on the inconsistencies between Smith's testimony and the statement and ignoring the consistencies—all to the benefit of the defense.

But appellant argues there was yet further prejudice suffered by him as a result of the court's alleged mishandling of the statement at trial. Citing *Lofty v. United States,* D.C.App., 277 A.2d 99 (1971) and *Coleman v. United States,* 125 U.S.App.D.C. 246, 249, 371 F.2d 343, 346 (1966), he points to the failure of the trial judge to give an instruction to the jury, sua sponte, at the crucial point in the midst of trial when the prosecution, on redirect examination of Smith, developed *consistencies* between his prior testimony from the stand and the statement itself.

*Coleman* and *Lofty* direct a trial judge to charge the jury during trial as soon as a written statement is produced for impeachment that it must not be considered by the jury as evidence of the truth of anything in that statement. These cases teach that this instruction must be given by the court unless counsel affirmatively requests the court not to do so. Appellant argues that in the absence of such a request by defense counsel here it was reversible error for the court to have failed, sua sponte, to instruct in the midst of trial that the prosecutor's use of the statement to rehabilitate his key witness went only to the credibility issue and not to the truth of the contents of that statement.

We are not persuaded by this argument under the circumstances here for it would mean that the defense at trial gained the advantage of presenting to the jury *inconsistencies* between Smith's testimony and the statement *without* any limiting charge from judge to jury; and, thereafter, the defense would on appeal be able to obtain a reversal because the trial court failed to give, sua sponte, an instruction concerning the limited purpose of the statement.[8] As we view the particular facts of the case when defense counsel used the statement to impeach Smith (just moments before the prosecutor used the statement to rehabilitate Smith) and said nothing to the court concerning a charge to the jury, his silence constituted in effect a tactical choice to have the court refrain from charging the jury then concerning the jury's use of the statement in evaluating Smith's credibility.

We are satisfied under the circumstances that the trial was conducted fairly and full opportunity for appellant to defend his case was afforded. The jury chose to believe Smith rather than appellant and we are constrained to affirm the judgment of conviction.

*So ordered.*

---

8. The record reflects that the prosecutor in his examination at trial of one of the two investigators and again in his closing argument to the jury emphasized that the statement went to the truthfulness of Smith's testimony. Thus, as a matter of fact the jury was alerted to the limited purpose of the use of the statement even before the court's instruction.