Jewel TURNER, Appellant,

v.

UNITED STATES, Appellee.

Walter A. BROOKS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 79–1094, 79–1135.

District of Columbia Court of Appeals.

Argued Nov. 5, 1980.

Decided March 12, 1982.

Frederic R. Kellogg, Washington, D. C., appointed by the court, for appellant Turner.

Robert Bunn, Washington, D. C., appointed by the court, for appellant Brooks.

Keith A. O'Donnell, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty. at the time the briefs were submitted, John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KERN and FERREN, Associate Judges, and GALLAGHER,* Associate Judge, Retired.

GALLAGHER, Associate Judge, Retired:

On the evening of April 9, 1978, Andre Reddick, Milton Heard, Roderick Anderson, and Joseph Doughton visited the apartment of one Wendall Smith, located at 1414 Swann Street, N.W. As Smith, Anderson, and Doughton were preparing to leave the apartment on an errand, appellant Jewel Turner arrived. He asked Smith for a bowl of cereal, which he ate while Smith, Anderson, and Doughton left. Appellant Turner departed soon thereafter, leaving Heard and Reddick alone. Some time later, Heard, who had fallen asleep, was roused by Reddick to find appellant Turner standing before him with a pistol. Another man standing behind Heard, later identified by

---

* Judge Gallagher was an Associate Judge of the court at the time of oral argument. His status changed to Associate Judge, Retired, on February 27, 1981.

him as appellant Walter A. Brooks, directed Reddick and Heard to empty their pockets. When Heard hesitated, Brooks reached into his pocket from behind and removed the sizeable bankroll Heard had in his possession. Heard and Reddick were then ordered to remove their shoes and socks and proceed toward the basement. As Heard walked toward the door, Brooks struck him in the head, knocking him to the floor. A shot then rang out from the vicinity of the door where Turner was standing, and the appellants fled. When Heard looked up, he discovered Reddick bleeding profusely from a wound in the neck which quickly proved fatal.

Appellants were charged with first-degree felony murder (D.C.Code 1973, § 22–2401) and armed robbery (*id.* –2901, –3202). Following a suppression hearing, appellants were tried before a jury, which rendered verdicts of guilty on all counts.

Both Turner and Brooks appeal from these judgments. We affirm.

## I

### Turner

■ Turner raises two points on appeal.[1] First, he argues that the trial court committed error in denying his two motions for severance, and a later motion for dismissal, on speedy trial grounds. Second, he contends that it was error for the trial court to have quashed his subpoena for police records of prior search warrants for the apartment at 1414 Swann Street, N.W. These contentions are without merit.

### A. Speedy Trial Claim

■ In reviewing alleged violations of the Sixth Amendment right to a speedy trial, we apply the four-pronged balancing test enunciated by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Under that test, we weigh the length of the delay, the

reasons for the delay, the defendant's assertion of the right, and the prejudice to the accused. *E.g., Gaffney v. United States*, D.C.App., 421 A.2d 924 (1980); *Bethea v. United States*, D.C.App., 395 A.2d 787 (1978); *Branch v. United States*, D.C.App., 372 A.2d 998 (1977). Applying the *Barker* test to the facts of this case, we concluded that the trial of appellant Turner some 16 months after his arrest did not violate his Sixth Amendment right to a speedy trial.

Turner was arrested on April 15, indicted on August 3, and arraigned on August 16, 1978. Trial of Brooks and Turner was originally set for November 20, 1978. On that date, a one day continuance was granted due to the illness of Brooks' counsel; Turner made no objection to this postponement. When the case was called the next day, Brooks' counsel was still ill, and the case was again continued—presumably with Turner's consent—until February 21, 1979. When inclement weather prevented the appearance of both defendants and Turner's attorney on February 21, a new trial date of April 12, 1979 was arranged by the court and counsel. On February 22, however, "at defense request" (according to the docket entry in Turner's case jacket), the case was continued for trial as a "back up case" until June 4, 18, 19, or 20, 1979. It was on June 4, 1979, when counsel for Brooks again requested a continuance until June 18 because of illness, that Turner first moved unsuccessfully for severance on speedy trial grounds. On June 18, Brooks' counsel was still ill and a continuance was granted until August 13, 1979. While the record indicates no opposition by Turner, he had renewed his motion for severance in writing on June 15, and it presumably registered his continuing desire for an immediate separate trial. On August 9, Turner filed his motion to dismiss on speedy trial grounds. A hearing thereon on August 13 delayed the trial one more day. Trial commenced on August

---

1. In his brief, appellant Turner also urged that the trial judge erred in imposing consecutive sentences for robbery and felony murder and in imposing two additional consecutive sentences under D.C.Code 1973, § 22–3202(a)(2). These

claims were rendered moot by the trial court's resentencing of Turner, during the pendency of this appeal, in accordance with *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).

14 and concluded with verdicts of guilty three days later.

■ At the outset, we note that a delay of a year or more between arrest and trial gives prima facie merit to a claim that an accused has been denied his right to a speedy trial. *Day v. United States*, D.C. App., 390 A.2d 957, 964 (1978); *Branch v. United States, supra* at 1000; *United States v. Mack*, D.C.App., 298 A.2d 509, 511 (1972).

■ Upon examination of the specific reasons for the various delays prior to Turner's first motion for severance, the government does not appear responsible for the nearly four month delay in the return of the indictment against Turner. In fact, a preliminary hearing was held on April 21, 1978—six days after Turner's arrest on a criminal complaint—and the case was promptly referred to the grand jury. The ten week delay in returning an indictment, as well as the first scheduling of trial for November 20, 1980—some 15 weeks thereafter—are totally attributable to the normal delay inherent in the operation of the court system, a delay which we assess as "basically neutral."[2] *Bowman v. United States*, D.C.App., 385 A.2d 28, 31 (1978); *see Gaffney, supra* at 928; *Bethea, supra* at 791. The postponement of trial from February 21 to April 12, 1979, cannot be counted heavily against the government. Trial could not be held on the appointed day because of inclement weather; and while the government must be charged with the delay caused by the court's inability to reschedule trial for an earlier date, we do not weigh such unavoidable institutional delays heavily. *See United States v. Perkins*, D.C. App., 374 A.2d 882, 883–84 (1977). Turner, rather than the government, is properly chargeable with the four months of delay (November 20, 1978-February 21, 1979) directly caused by his codefendant's first two requests for continuances, since we must

infer, in the absence of objection or a request for severance, that Turner assented to the postponement. Moreover, the record shows that counsel for Turner was himself directly responsible for another two-month delay when he requested in advance that the trial be continued from April 12 to June 4, 18, 19, or 20, 1979. *See Bowman, supra* at 31. This totals six months.

We are not unmindful of Turner's later attempts after June 4, 1979 to secure a severance so that he could avoid further trial delays occasioned by the illness of counsel for his codefendant Brooks.

We are not prepared to say that on the facts of this case, the trial judge abused his discretion in denying Turner's motion for severance. *See Bittle v. United States*, D.C.App., 410 A.2d 1383, 1386 (1980); *Cunningham v. United States*, D.C.App., 408 A.2d 1240, 1243 (1979); *Sousa v. United States*, D.C.App., 400 A.2d 1036, 1041, *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *Johnson v. United States*, D.C.App., 398 A.2d 354, 367 (1979). *Cf. Hamilton v. United States*, D.C.App., 395 A.2d 24, 27 (1978), *quoting Clark v. United States*, D.C.App., 367 A.2d 158, 160 (1976) (trial court has "extremely wide latitude" in determining whether to sever, and findings will not be disturbed unless clearly erroneous). At the time Turner first moved for severance (June 4, 1979), he had already been held for almost 14 months. While the larger portion of this delay must be attributed to the government, we do not weigh it heavily against the prosecution because of the nature of the delay. We must charge Turner himself with at least six months of this delay. This leaves a defendant in a poor position to prevail on lack of a speedy trial claim. Additionally, the only allegation of prejudice in Turner's written motion was that the memory of witnesses and that of Turner himself might fade if trial were

---

2. *Cf. Day, supra* at 966, where we held that such a period is not "chargeable specially against the government" on the ground that it consisted totally of " 'routine normal delay[s] inherent in judicial procedures,' *Bond v. United*

*States*, D.C.App., 233 A.2d 506, 511 (1967), concerning which 'no real basis appears . . . for faulting either side.' *United States v. Jones*, 154 U.S.App.D.C. 211, 213, 475 F.2d 322, 324 (1972)."

not held expeditiously.[3] We can see no clear error in the trial judge's determination that an added delay of one or two months would be unlikely to lead to a significant further weakening of the defendant's case.[4] Nor do we find any abuse of discretion in the trial court's judgment that this slight possibility of prejudice was outweighed by an interest in judicial economy, see *Bittle, supra* at 1386, as well as by Turner's failure to have earlier asserted his desire for immediate trial.

█ We conclude further that it was not error for the trial judge to have denied Turner's pretrial motion to dismiss for want of a speedy trial. While there were ten weeks between Turner's first request for severance and his motion to dismiss, we do not believe that this relatively short period of time significantly prejudiced Turner further, either personally or in his defense. That his defense was not impaired in fact by even the full 16 month delay, a substantial part of which was attributable to the defense, seems evident from Turner's failure to point to any concrete impairments to his case, either in a renewed motion to dismiss made after trial or in his argument before this court.[5] *See Reid v. United States,* D.C.App., 402 A.2d 835, 837 (1979); *Bowman, supra* at 32. Applying the four-pronged test of *Barker v. Wingo, supra,* we conclude that the delay between Turner's arrest and trial did not constitute a violation of the Sixth Amendment.

B. *Quashing of the Subpoena*

█ Appellant Turner's second claim is that it was error for the trial court to have quashed his subpoena of certain police records. This subpoena, which was served on Chief of Police Burtell Jefferson on May 18,

1979, requested copies of all search warrants for the premises of 1414 Swann Street, N.W.—the site of the homicide and robbery—which were issued between January 1, 1976 and April 9, 1978 (the day after the crimes). Defendant argued that these warrants were needed to substantiate his theory that the apartment was a notorious house of prostitution and drug distribution point; and that there was a significant likelihood that other "guests" at the apartment might have had the motive and opportunity to rob the victims at gunpoint. Upon the government's motion, the trial court quashed the subpoena as oppressive. Appellant Turner argues that this was error. We disagree.

Super.Ct.Cr.R. 17(c) provides that "[t]he court on motion made promptly may quash or modify the *subpoena* if compliance would be unreasonable or oppressive." We have held that the court's decision to quash *vel non* will be reversed only where it rises to the level of an abuse of discretion, that is, is either arbitrary or without record support. *See Cooper v. United States,* D.C.App., 353 A.2d 696, 702 (1976). In *Cooper,* we established the burden upon the applicant for the subpoena:

[The] party seeking a subpoena duces tecum [must] show the following:

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not

---

3. Because Turner was sentenced to 7 to 28 years in prison on unrelated charges on August 11, 1978, we think that any prejudice alleged to have resulted from the fact of his detention pending trial in this case would be minimal. *See Gaffney, supra* at 929.

4. We note also that "[p]ossible prejudice is inherent in any delay, however short; it may also weaken the Government's case." *United States v. Marion,* 404 U.S. 307, 322, 92 S.Ct.

455, 464, 30 L.Ed.2d 468 (1971) (emphasis added).

5. As we noted in *Bethea, supra,* a post-verdict hearing on a speedy trial claim provides "the most useful perspective and basis for determining whether delay has been prejudicial." *Id.* at 793. *Accord, United States v. MacDonald,* 435 U.S. 850, 859, 98 S.Ct. 1547, 1552, 56 L.Ed.2d 18 (1978).

intended as a "fishing expedition." [*Id.* at 701, quoting *United States v. Nixon*, 418 U.S. 683, 699–700, 94 S.Ct. 3090, 3103–04, 41 L.Ed.2d 1039 (1974).]

The trial court correctly concluded that the evidence sought to be adduced through the search warrants would have been irrelevant to the charges against Turner. Even if the warrants had shown the existence of drug traffic and prostitution at the apartment during the two and one half years before the murder and robbery here, it would be mere speculation to conclude from this history that someone other than the defendants had been present at the specific time of these crimes. Nothing in the record or proffered by either party even remotely suggested that someone other than the defendants had either the motive or the particular opportunity to commit the crimes with which the defendants were charged. On the other hand, several witnesses, including the surviving victim, placed appellant Turner in the apartment at the time of the crime. The court rightly concluded that the non-probative nature of the warrants suggested that the subpoena was intended as a "fishing expedition." This, coupled with the fact that the warrants were public information, furnished a more than adequate basis for the trial judge to quash the subpoena.

## II

### Brooks

Appellant Brooks raised four grounds of appeal, none of which we find meritorious. He claims that (1) the court committed plain error by admitting the prior inconsistent statement of a defense witness as substantive evidence; (2) it was error for the court to have failed to suppress the in-court and pretrial identification of Brooks by complainant Heard; (3) the court improperly admitted a statement Brooks gave to the police shortly after his arrest; (4) the court erred in failing to declare a mistrial when the prosecutor made a prejudicial remark in his closing argument.[6]

### A. *Admission of the Prior Inconsistent Statement*

Wendall Smith, the regular occupant of the apartment at 1414 Swann Street, N.W., was called as a witness by appellant Turner. He testified that he had seen neither Turner nor Brooks at or near the apartment on the night of the robbery and murder. On cross-examination, counsel for appellant Brooks sought to clear up the discrepancy between this account and a statement given by Smith to the police on the night of the crimes (later incorporated into Smith's testimony before the grand jury) in which he had said that when he left the apartment that night with Anderson and Doughton, he saw Brooks outside the apartment washing his car. Smith testified that this statement was untrue—that Brooks had in fact washed his car the evening before the crimes, and that he, Smith, had lied because of police pressure. On cross-examination, the prosecutor established that Smith had told the police that he had left Turner in the apartment with Heard and Reddick, and that he had seen Brooks outside. Smith testified that he was at various junctures either telling the police only what Heard had told him or what he, Smith, supposed the police wanted to hear. He admitted, however, that he had failed to disavow or clarify his allegedly incorrect statements before the grand jury.

---

**6.** Appellant also challenges the trial court's denial of his motions for acquittal and its giving of the *falsus in uno* instruction. In light of our disposition of the second and third issues, *supra*, we hold that the evidence was sufficient to withstand appellant's motions for acquittal. *See Russell v. United States*, D.C.App., 348 A.2d 299, 300 (1975); *Marshall v. United States*, D.C.App., 340 A.2d 805, 808 (1975); *Crawford v. United States*, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967). The conten-

tion concerning the *falsus in uno* instruction likewise lacks merit. Although we recently held in *Kinard v. United States*, D.C.App., 416 A.2d 1232 (1980), that this instruction should no longer be given, our decision was prospective only. In the case before us, whether to give that instruction was a matter within the discretion of the trial judge. Under the circumstances, we conclude the instruction did not prejudice appellant Brooks and there was no abuse of discretion.

When the prosecutor moved into evidence the portion of the grand jury transcript in which Smith expressly adopted his statement to the police, the trial judge informed him that it was already in evidence by virtue of defense counsels' stipulation that the proffered document was in fact the transcript of the proceedings. Neither defense counsel objected to this, nor was an immediate cautionary instruction requested or given sua sponte. When the judge charged the jury, he gave the following instruction:

> The testimony of a witness may be discredited or impeached by showing that he has previously made statements which are inconsistent with his present testimony. Such prior statements are admitted into evidence, solely for your consideration in evaluating the credibility of the witness. Should you find the prior statement to be inconsistent, you may consider such statements only in connection with your evaluation of the truth of the witness' present testimony in court.
>
> You must not consider the prior statement as establishing the truth of any facts contained in that statement. *Where the testimony of a witness at trial is inconsistent with the prior statement of the witness and the prior statement was given under oath, subject to the penalties of perjury at another proceeding, you may consider the prior statements, both in evaluating the credibility of the witness and as evidence of any facts contained in the prior statement.*

> *Should you find the prior statement to be inconsistent with the witness' testimony, you may consider the statement in determining what credence to be given the witness' present testimony in court. Should you find the prior statement to be truthful, you may consider it as evidence in the case.* (Emphasis supplied.)

No objection was made to this instruction.

▮▮▮ Contrary to the rule in the federal courts relating to prior inconsistent statements under oath,[7] the rule in this jurisdiction is that prior inconsistent statements of a witness are hearsay and not admissible as proof of the matters contained therein.[8] *Webster v. M. Loeb Corp.,* D.C.App., 400 A.2d 319, 322 n.1 (1979); *Jefferson v. United States,* D.C.App., 328 A.2d 85, 86 n.6 (1974); *United States v. Wright,* 160 U.S. App.D.C. 57, 63, 489 F.2d 1181, 1187 (1973); *United States v. Gilliam,* 157 U.S.App.D.C. 375, 378, 484 F.2d 1093, 1096 (1973); *Byrd v. United States,* 119 U.S.App.D.C. 360, 361, 342 F.2d 939, 940 (1965); *Firemen's Insurance Co. of Washington, D. C. v. Henry Fuel Co.,* D.C.App., 245 A.2d 127, 128 & n.2 (1968); *Byrd v. District of Columbia,* D.C. Mun.App., 43 A.2d 46, 48 (1945). *See Washington v. United States,* D.C.App., 397 A.2d 946, 949 (1979); *Forbes v. United States,* D.C.App., 390 A.2d 453, 456–57 (1979); *Jackson v. United States,* D.C.App., 354 A.2d 869, 873 (1976). Accordingly, to the extent that the trial judge's facially inconsistent instruction is interpretable as authorizing the jury to consider Smith's earlier statement before the police and grand jury as substantive evidence, that instruction was error.[9] In light of Brooks' failure to

---

7. F.R.Evid. 801(d)(1) classifies as "not hearsay" prior statements of a witness which are inconsistent with his present testimony, so long as they were given under oath and the witness is presently "subject to cross-examination concerning the statement[s]." The Conference Report on this rule as adopted expressly noted that it covers statements before a grand jury. 11 Moore's Federal Practice ¶ 801.01[4.–4], at VIII 23, 24 (2d ed. 1976).

8. The trial judge mistakenly read, *verbatim, both* alternative versions of Jury Instruction 1.06, entitled "Evaluation of Prior Consistent and Inconsistent Statements," insofar as they pertained to prior inconsistent statements. *See* Young Lawyers Section of the Bar Association

of the District of Columbia Criminal Jury Instructions, Instruction 1.06, at 17 (3d ed. 1978). The comment to this suggested instruction expressly notes that the first version (in roman type in the above quotation) is for use in the Superior Court, the second (italicized above), for use in the United States District Court. *See id.* at 18.

9. In *Watts v. United States,* D.C.App., 362 A.2d 706 (1976) (en banc) we recognized an exception to this rule when we said "When a witness . . . affirms the truth of a prior statement, the earlier statement is to be considered 'not only as bearing on the credibility of the witness but as affirmative evidence.' " *Id.* at 711–12 n.11,

object to either the substance or timing of this instruction, however, our task is to decide whether the court committed plain error. *See* Super.Ct.Cr.R. 30, 52(b); *Johnson v. United States*, D.C.App., 387 A.2d 1084, 1086–87 (1978); *Hall v. United States*, D.C.App., 383 A.2d 1086, 1088 (1978); *Watts v. United States*, D.C.App., 362 A.2d 706, 708–09 (1976) (en banc); *Adams v. United States*, D.C.App., 302 A.2d 232, 234–35 (1973); *Bunter v. United States*, D.C.App., 245 A.2d 839, 841–42 (1968). We may reverse only if the error now complained of was "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States, supra* at 709. *See* D.C.Code 1973, § 11–721(e). Several facts take this case out of the realm of plain error.

Smith's earlier statement was, at most, cumulative evidence of Brooks' presence at the scene. While complainant Heard's identification of Brooks may have been subject to some doubt, it was reinforced by Brooks' own admission to the police that he was present when the crimes occurred. *See* Part II C, *infra.* This evidence is clearly sufficient to support a conviction even if Smith's statement is ignored.

Second, we have on several occasions expressed doubt that the traditional rule against admission into evidence of prior inconsistent statements remains an "*essential* principle[ ] of law concerning which it is the duty of the trial judge to instruct the jury whether requested or not." *George v. United States*, 75 U.S.App.D.C. 197, 201, 125 F.2d 559, 563 (1942) (emphasis added). We have doubted whether the rights safeguarded by our rule that prior inconsistent statements may not be admitted for their truth

are so "substantial" that departure from the rule necessarily "jeopardize[s] the very fairness and integrity of the trial." *See Watts, supra* at 709.

For example, in *Forbes, supra*, we held that it was not plain error for the trial court to have altogether failed to instruct the jury, sua sponte, as to the limited admissibility of a witness' prior inconsistent statement. We pointedly observed that there, as here, the prior statement would have been fully admissible under Fed.R. Evid. 801(d)(1)[10] had the trial been a federal one; and that "[o]ne would have to consider the federal judiciary has gone far afield in the reasoning underlying its rule in order to conclude ... that there was plain error here." *Id.* at 457. One would hardly seriously contend that the admissibility of prior inconsistent statements has rendered all recent federal prosecutions in which such statements have arisen "miscarriage[s] of justice." *Adams, supra* at 234.

Accordingly, even if the jury had construed the trial judge's confused charge as permitting the substantive use of Smith's prior statement, no clear prejudice has been shown by appellant Brooks. The court's charge was error in this jurisdiction, but not the required plain error.

B. *Failure to Suppress Heard's Identification of Brooks*

Brooks' second contention is that it was error for the trial court to have failed to suppress Heard's in-court and pretrial identifications of Brooks. Appellant claims that Heard's in-court identification of Brooks as the man who stood behind him during the robbery was tainted by the unreliability of and suggestiveness surrounding his pretrial

---

quoting *United States v. Borelli*, 336 F.2d 376, 391 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The government argues that the following colloquy put Smith's prior statement within this exception:

[Prosecutor]: You don't know whether you told them [the grand jury] the truth?

[Smith]: Based on what I know, yes, I told them the truth.

[Prosecutor]: So, what's here is what you told them?

[Smith]: Yes, I believe so.

We think that, at best, this exchange only served to confirm Smith's account at trial that his earlier statement that Turner and Brooks were present on the day of the crimes was based on what he had been told by Heard. A fair reading of Smith's testimony at trial belies any suggestion that he was affirming the truthfulness of his statements to the police and grand jury.

10. *See* note 7, *supra.*

identification of Brooks. We hold that both identifications were properly admitted.

On April 18, 1978, nine days after the robbery and murder, Heard was shown a photograph of a lineup held on August 31, 1977, some seven and one-half months before the incident. Although Brooks was a participant in this lineup, Heard failed to identify him from the photograph. Heard was also unable to recognize Brooks in an array of individual "mug shots." However, Heard did identify appellant Turner as the gunman from a second lineup photograph dated September 14, 1977, and from a separate photographic array. A lineup was held on May 9, 1978 at which Heard successfully identified both appellants. He later made in-court identifications of both Turner and Brooks at trial.

Brooks first urges that the pretrial identification procedures were unduly suggestive. Specifically, Brooks contends that the May 9, 1978 lineup was impermissibly tainted by the fact that the only participants therein whose pictures had also been shown to Heard on April 18, 1978 were Turner (who Heard had then identified) and Brooks (who Heard had not recognized from his photograph). Brooks suggests that Heard recognized him at the lineup only because "(i) it was the same face he had seen twice before in photographs, (ii) Brooks was shown with Turner, and (iii) Brooks was the only lineup participant whose photograph was with Turner's photograph when Heard identified Turner."

■ The Supreme Court suggested in *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) that the admission of identifications secured through "unnecessarily suggestive" procedures might violate due process. But as the Court later made explicit in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), *Stovall* was not intended to announce a *per se* exclusionary rule; rather, the *Manson* Court stated, "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 114, 97 S.Ct. at 2253. If, under the totality of the circumstances, the court is convinced that the identification was reliable even though the identification procedure was suggestive, the identification evidence should be admitted. *Id.* at 106, 97 S.Ct. at 2249; *see Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *United States v. Marchand,* 564 F.2d 983, 995–96 (2d Cir. 1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). There is, in such a case, no "substantial likelihood of irreparable misidentification" so as to deny due process, *see Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), and short of that point, such identification evidence is to become "grist for the jury mill." *Manson v. Brathwaite, supra* 432 U.S. at 116, 97 S.Ct. at 2254.

■ As a preliminary matter, we are unimpressed by appellant Brooks' contention that the identification procedures employed here were necessarily suggestive. First, the mere fact that a full three weeks before the May 9 lineup, Heard had been shown two photographs of Brooks hardly suggests that the police were in effect saying *"This* is the man." *See Foster v. California,* 394 U.S. 440, 443, 89 S.Ct. 1127, 1129, 22 L.Ed.2d 402 (1969). The detective who had shown Heard the photographs testified at trial that he showed Heard the individual photo of Brooks only because the photo of the lineup was seven and one half months old; but the individual photo proved to be an even poorer likeness of Brooks as he looked at the time of the crimes, and there is no indication that Heard even noticed that he had been shown two photographs of the same man. Heard's failure to recognize Brooks at this photograph viewing session makes it unlikely that his unequivocal identification of Brooks at a live lineup three weeks later was due to the earlier presentation of two photographs. Second, placing Brooks and Turner in the same lineup on May 9 would not tend to focus more attention on Brooks than on any other participant in the lineup. Finally, in light of Heard's failure to focus on, much less identify, Brooks' photos at the photograph viewing session, we think it unlikely that Heard

would have detected that he had been shown photos of only one individual in the lineup besides Turner at the session three weeks earlier. In short, these facts and nothing more do not present a prima facie case of suggestiveness.

■ Even if we assume arguendo, however, that there was some amount of unnecessary suggestiveness surrounding Heard's identification of Brooks, we are satisfied that "the corrupting effect" of this suggestiveness would not outbalance the independent indicia of the identification's reliability. See Patterson v. United States, D.C. App., 384 A.2d 663, 666 (1978); Manson v. Brathwaite, supra 432 U.S. at 114, 97 S.Ct. at 2253. While it is true that Heard testified that he had been asleep when Turner and Brooks entered, and that he only had occasion to look at the face (but not the clothes) of the man behind him for a short time soon after waking, he also testified that he "looked at him pretty good" and noted that he had close-cropped hair. Moreover, on the night of the crimes, Heard stated to police that the man behind him was younger, shorter and less heavy than himself—a description perhaps not overly specific, but not challenged as inaccurate. Finally, Heard said that it was only when he saw Brooks in the flesh at the May 9 lineup that he "knew" Brooks was the man he had seen, a confidence he reaffirmed in identifying Brooks in court.

Our conclusion that Heard's lineup identification of Brooks was basically reliable is not, of course, to say that it was absolutely reliable. It is only to say that due process does not require suppression of either the lineup or in-court identification.[11] Heard's identification of Brooks was not unimpeachable. At trial, defense counsel thoroughly exposed the weaknesses attending Heard's pretrial identification of Brooks. As the Supreme Court stated in Manson v. Brathwaite, supra :

We are content to rely upon the good sense and judgment of . . . [the] jur[y], for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature. [Id. 432 U.S. at 116, 97 S.Ct. at 2254]

"In the absence of suggestive procedure, the reliability of an identification may be challenged in the traditional manner before a jury in the courtroom by attacking the credibility of the witness." Allen v. Estelle, 568 F.2d 1108, 1112 n.6 (5th Cir. 1978).

### C. Admission of Brooks' Statement to the Police

On May 3, 1978, the day he was arrested, appellant Brooks was interviewed by two detectives. He was read his Miranda rights[12] and indicated that he understood them, but did not sign the rights card because (the detective testified) his arm was in a cast. Brooks indicated that he was willing to answer questions without having an attorney present, and proceeded to give the detectives a statement, which was transcribed. He initially stated that, on the night of the shooting, he had gone to Smith's apartment about 5:00 or 6:00 p. m. and borrowed a bucket from Smith. When he went to return the bucket at 7:00 or so, Smith was not at home, but he was admitted by a man he had never seen before; three men were in the apartment, although he was not sure whether Turner was among them; and while he was in a back room he heard a shot, ran from the house, and went home and fell asleep. At this point, the detectives told Brooks they did not believe him, and (falsely) that Turner had already given a statement inculpating him. Brooks then asked for permission to telephone his mother. After a brief conversation with her, Brooks told the detectives that he did not want "to protect the guilty any longer."

11. Since we have determined that Heard's pretrial identification of Brooks was admissible, it follows that his in-court identification of Brooks was proper. See Allen v. Estelle, supra at 1114. See also Patterson, supra at 667.

12. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

He said that when he returned the bucket at 7:00 p. m., Turner was in fact present, and that, after some conversation, as Brooks prepared to leave, Turner pulled a gun and told him to relieve the other two men of their valuables. When Brooks protested that he did not want "to be a part of this," Turner told him that he "was going to help him take the niggers upstairs." Brooks claimed that he immediately bolted through the door, got in his car, and drove away, without hearing a shot or seeing Turner or the stolen money thereafter. Although he stated that he could read and write and had a ninth grade education, Brooks refused to sign this statement after reading it, stating that "I just don't want to sign it. I just want to tell the truth."

Despite the trial judge's ruling at the suppression hearing that Brooks' full statement was admissible, the statement itself was never moved into evidence at trial. On direct examination, the prosecution asked the detective who had questioned Brooks only a single question relative to Brooks' statement:

Q. At that time, sir, [did] Mr. Brooks indicate[ ] to you whether or not he was present in 1414 Swann Street when that robbery occurred?

A. Yes. He stated that he was.[13]

Appellant Brooks argues on appeal that it was error for the trial court to have permitted the detective to testify concerning Brooks' statement, on the ground that the statement was involuntarily given and thus illegally obtained. Brooks also points to the detectives' trickery in falsely suggesting to Brooks that Turner had inculpated him as "the most compelling consideration with respect to involuntariness," and the government has locked horns on this issue. But the text of Brooks' statement, as detailed at the suppression hearing, unequivocally demonstrates that Brooks told the detectives *before* being shown the false statement of Turner that he had been present during (although did not participate in) the rob-

bery and shooting. While both consistent and inconsistent versions of this sequence were extracted from the detective at trial— perhaps attributable to the fact that he did not have a copy of Brooks' statement before him when he recounted its contents—this only gave Brooks the advantage of being able to argue to the jury that he had said *nothing* to the police until tricked into it, when he in fact had said *at least* that he was present in the apartment at the time of the crimes. We do not, however, regard the detectives' ploy here as relevant to the question of the admissibility of the particular portion of Brooks' statement recounted by the detective at trial. We thus do not reach the question of whether the trick employed here would have affected the admissibility of any portion of Brooks' statement subsequent thereto. *See In re D.A.S.,* D.C.App., 391 A.2d 255, 256 (1978) (holding that "the use of artifice does not by itself invalidate an otherwise voluntary confession").

We confine inquiry to appellant's argument that the length and intensity of his interrogation, coupled with his failure to sign both his *Miranda* waiver card and his written statement, amount to a showing that his statement was involuntary. We find no merit in this argument.

Whether an accused has voluntarily waived his rights to remain silent and to have an attorney present during questioning must be determined by analyzing the particular facts and circumstances surrounding the purported waiver. *Rosser v. United States,* D.C.App., 313 A.2d 876, 878 (1974). *See also North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Conversely, the trial court may, in deciding this question, "properly consider the absence of circumstances tending to militate against a valid waiver." *Walden v. United States,* D.C.App., 351 A.2d 515, 517 (1976), *quoting United States*

---

**13.** The prosecutor's apparent design in asking only this question was to refute Brooks' alibi defense without touching upon the elements in the second half of his statement, which would tend to exculpate himself and incriminate Turner.

*v. McNeil*, 140 U.S.App.D.C. 3, 6, 433 F.2d 1109, 1112 (1969). In any event, the government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Lego v. Twomey*, 404 U.S. 477, 487–89, 92 S.Ct. 619, 625–27, 30 L.Ed.2d 618 (1972).

The government showed that only about one and a quarter hours elapsed from the time Brooks was first read his *Miranda* warnings to the time the detectives finished typing Brooks' three-page statement. Only ten minutes had passed, however, when Brooks indicated that he wished to make a statement. He was at this time readvised of his rights, and again orally acknowledged that he understood them but wished to speak without benefit of counsel. Appellant does not allege nor does the record suggest that he was in fact not advised of his rights, or threatened, mistreated, or promised special treatment. While counsel for Brooks faulted the detectives' failure to affirmatively test whether Brooks could read, counsel failed to proffer any evidence that Brooks was not telling the truth when he said in his statement that he could read and had finished the ninth grade. Moreover, Brooks was no stranger to custodial interrogation, having been previously arrested on a charge of armed robbery.

 While we ordinarily subject a written inculpatory statement to close scrutiny where the accused has not signed either his waiver card or the statement itself, we are satisfied that the failures here were not significant. Although we have held that even an unexplained failure to sign a waiver card does not preclude a finding of a valid waiver, *Walden, supra* at 517, the detective testified that Brooks did not sign his waiver card because of an injured arm, an explanation corroborated by Brooks' bail

release form and not controverted at trial. Moreover, Brooks' apparent refusal to sign the detective's typed transcript of his statement does not, on the facts of this case, affect the admissibility of the detective's testimony that Brooks had admitted being present during the robbery. *Pettyjohn v. United States*, 136 U.S.App.D.C. 69, 73, 419 F.2d 651, 655 (1969), *cert. denied*, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1979).[14]

Accordingly, we hold that the evidence was sufficient to support the trial court's finding that Brooks' statement was voluntarily made, and thus, admissible.

### D. *Prejudicial Remark in Prosecutor's Closing Argument*

 Brooks' final contention is that it was error for the trial court to have denied his motion for a mistrial following the government's rebuttal argument, in which the prosecutor appealed to the jury to judge the case as though the deceased victim "were your son, your husband, your brother." Brooks argues that this was an improper attempt to influence the jury. We hold that, even assuming it was, reversal is not warranted.

We have stated that "prosecutors should adhere to standards which 'uphold the dignity of the Government,'" *Sellars v. United States*, D.C.App., 401 A.2d 974, 977–78 (1979), *quoting Taylor v. United States*, 134 U.S.App.D.C. 188, 189, 413 F.2d 1095, 1096 (1969), and, in particular, that it is wrong for the prosecutor to urge the jurors to place themselves "in the shoes" of the victim. *Clarke v. United States*, D.C.App., 256 A.2d 782, 786–87 (1969). Nevertheless, we have also abided objectionable prosecutorial remarks when they came in response to arguments made by the defense. *See, e.g.,*

---

14. Appellant attempts to distinguish *Pettyjohn* by arguing that, here, unlike in *Pettyjohn*, the accused "gave a different version prior to giving the version from which the detective's in-court testimony arose, . . . then repudiated the final statement by not signing it." We think that, as a matter of record, these claims are factually inaccurate. First, the detective's testimony was based on Brooks' first version of the crime, not the second; and in any case, the

two versions are identical vis-a-vis Brooks' admitted presence at the scene (the only matter testified to). Second, we do not think that Brooks can fairly be said to have repudiated his statement. When asked at the conclusion of his statement why he did not want to sign it, he responded, "I just don't want to sign it. I just want to tell the truth." This permits the inference that Brooks was reaffirming, rather than repudiating his statement.

Khaalis v. United States, D.C.App., 408 A.2d 313, 346 (1979); Reed v. United States, D.C.App., 403 A.2d 725, 730 (1979); Christian v. United States, D.C.App., 394 A.2d 1, 33 n.86 (1978), cert. denied sub nom. Clark v. United States, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); Medina v. United States, D.C.App., 315 A.2d 169, 170 (1974). In this case, the prosecutor's remark was responsive to the closing argument of counsel for appellant Turner, in which he said to the jury:

> You must sit here and judge Mr. Turner, just as if you were in that seat or if a member of your family was in that seat. And, that's the justice I ask from you, ladies and gentlemen, to judge Mr. Turner, just as you would want to be judged, or if a member of your family is being judged here today.... I ask you to return to this courtroom and bring in the one and only verdict of not guilty for Mr. Turner and send him home with his wife and five children.

We need not decide, however, whether these remarks are fairly imputable to Brooks as well as Turner, or whether the prosecutor's argument that the jury should judge the case as if the deceased victim were a family member would be unobjectionable. For, even assuming arguendo that Brooks can properly complain of the prosecutor's remark, we are convinced that it did not infect the verdict. See Dyson v. United States, D.C.App., 418 A.2d 127, 132 (1980); Johnson v. United States, D.C.App., 386 A.2d 710, 713 (1978). Although not in the best traditions of government, the misconduct was not egregious, was not directly related to the question of appellant's guilt, and was soon followed by the court's charge that the jury should judge the evidence without prejudice or sympathy. See, supra at 731; Smith v. United States, D.C.App., 315 A.2d 163, 166, cert. denied, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974); Gaither v. United States, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969). Under these circumstances, we cannot say that the prosecutor's remark so prejudiced appellant as to entitle him to a new trial.

Affirmed.